# United States Court of Appeals
## For the First Circuit

No. 07-2631

UNITED STATES OF AMERICA,

Petitioner, Appellant,

v.

TEXTRON INC. AND SUBSIDIARIES,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, Senior U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Boudin, Lipez and Howard,
Circuit Judges.

Judith A. Hagley, Tax Division, Department of Justice, with whom David I. Pincus, Robert W. Metzler, Attorneys, Tax Division, Department of Justice, John A. DiCicco, Acting Assistant Attorney General, Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General, and Robert Clark Corrente, United States Attorney, were on supplemental brief for appellant.
John A. Tarantino with whom Patricia K. Rocha, Adler Pollock & Sheehan P.C., Arthur L. Bailey, J. Walker Johnson and Steptoe & Johnson LLP were on supplemental brief for appellee.
Professor Claudine V. Pease-Wingenter, Phoenix School of Law, on brief in support of appellee Textron Inc., Amicus Curiae.

David M. Brodsky, Robert J. Malionek, Adam J. Goldberg, Latham & Watkins LLP, Robin S. Conrad, Amar D. Sarwal, National Chamber Litigation Center, Inc., Susan Hackett, Senior Vice President and General Counsel, Association of Corporate Counsel, on brief in support of Textron Inc., Amici Curiae.

_____

OPINION EN BANC

August 13, 2009

**BOUDIN, Circuit Judge.** The question for the en banc court is whether the attorney work product doctrine shields from an IRS summons "tax accrual work papers" prepared by lawyers and others in Textron's Tax Department to support Textron's calculation of tax reserves for its audited corporate financial statements. Textron is a major aerospace and defense conglomerate, with well over a hundred subsidiaries, whose consolidated tax return is audited by the IRS on a regular basis. To understand the dispute, some background is required concerning financial statements, contingent tax reserves and tax audit work papers.

As a publicly traded corporation, Textron is required by federal securities law to have public financial statements certified by an independent auditor. See 15 U.S.C. §§ 78l, 78m (2006); 17 C.F.R. § 210 et seq. (2009). To prepare such financial statements, Textron must calculate reserves to be entered on the company books to account for contingent tax liabilities. Such liabilities, which affect the portrayal of assets and earnings, include estimates of potential liability if the IRS decides to challenge debatable positions taken by the taxpayer in its return.

The calculation of such reserves entails preparing work papers describing Textron's potential liabilities for further taxes; these underpin the tax reserve entries in its financial statement and explain the figures chosen to the independent auditor who certifies that statement as correct. By examining the work

-3-

papers the accountant discharges its own duty to determine "the adequacy and reasonableness of the corporation's reserve account for contingent tax liabilities." United States v. Arthur Young & Co., 465 U.S. 805, 812 (1983) (rejecting claim of accountant work product privilege protecting such work papers).[1]  The work papers are thus one step in a process whose outcome is a certified financial statement for the company.

In Textron's case, its Tax Department lists items in the tax return that, if identified and challenged by the IRS, could result in additional taxes being assessed.  The final spreadsheets list each debatable item, including in each instance the dollar amount subject to possible dispute and a percentage estimate of the IRS' chances of success.  Multiplying the amount by the percentage fixes the reserve entered on the books for that item.  The spreadsheets reflecting these calculations may be supported by backup emails or notes.

A company's published financial statements do not normally identify the specific tax items on the return that may be debatable but incorporate or reflect only the total reserve figure. As the Supreme Court explained in Arthur Young, tax accrual work

---

[1]The procedural requirement that auditors examine tax accrual work papers is based on a combination of Statement on Auditing Standards No. 96, Audit Documentation (2002), superseded by Auditing Standards No. 3, Audit Documentation (2004); Statement on Auditing Standards No. 326, Evidential Matter (1980); and Auditing Interpretation No. 9326, Evidential Matter: Auditing Interpretations of Section 326 (2003).

papers provide a resource for the IRS, if the IRS can get access to them, by "pinpoint[ing] the 'soft spots' on a corporation's tax return by highlighting those areas in which the corporate taxpayer has taken a position that may, at some later date, require the payment of additional taxes" and providing "an item-by-item analysis of the corporation's potential exposure to additional liability."  465 U.S. at 813.

The IRS does not automatically request tax accrual work papers from taxpayers; rather, in the wake of Enron and other corporate scandals, the IRS began to seek companies' tax accrual work papers only where it concluded that the taxpayer had engaged in certain listed transactions "that [are] the same as or substantially similar to one of the types of transactions that the [IRS] has determined to be a tax avoidance transaction."  26 C.F.R. § 1.6011-4(b)(2) (2009).  Only a limited number of transactions are so designated.[2]

The present case began with a 2003 IRS audit of Textron's corporate income tax liability for the years 1998-2001.  In reviewing Textron's 2001 return, the IRS determined that a Textron subsidiary--Textron Financial Corp. ("Textron Financial")--had engaged in nine listed transactions.  In each of the nine

---

[2]A current list of such transaction types, amounting to less than three dozen, appears at Internal Revenue Service, Recognized Abusive and Listed Transactions - LMSB Tier I Issues, http://www.irs.gov/businesses/corporations/article/0,,id=120633,00.html (visited July 7, 2009).

instances, Textron Financial had purchased equipment from a foreign utility or transit operator and leased it back to the seller on the same day.  Although such transactions can be legitimate, the IRS determined that they were sale-in, lease-out ("SILO") transactions, which are listed as a potential tax shelter subject to abuse by taxpayers.

SILOs allow tax-exempt or tax-indifferent organizations--for example, a tax-exempt charity or a city-owned transit authority--to transfer depreciation and interest deductions, from which they cannot benefit, to other taxpayers who use them to shelter income from tax.  Where the only motive of a sale and lease back is tax avoidance, it can be disregarded by the IRS and taxes assessed on the wrongly sheltered income.[3]

Textron had shown the spreadsheets to its outside accountant, Ernst & Young, but refused to show them to the IRS. The IRS issued an administrative summons pursuant to 26 U.S.C. § 7602 (2006), which allows the IRS, in determining the accuracy of any return, to "examine any books, papers, records, or other data which may be relevant or material to such inquiry."  Id. § 7602(a)(1).  According to IRS policy, where the taxpayer claims

---

[3]See AWG Leasing Trust v. United States, 592 F. Supp. 2d 953, 958 (N.D. Ohio 2008) (upholding denial of depreciation and interest deductions for SILO transaction); I.R.S. Notice 2005-13, 2005-9 I.R.B. 630 (Feb. 11, 2005); Shvedov, Tax Implications of SILOs, QTEs, and Other Leasing Transactions with Tax-Exempt Entities 10-12, CRS Report for Congress (Nov. 30, 2004).

-6-

benefits from only a single listed transaction, the IRS seeks only the workpapers for that transaction; but where (as in Textron's case) the taxpayer claims benefits from multiple listed transactions, the IRS seeks all of the workpapers for the tax year in question. I.R.S. Announcement 2002-63, 2002-27 I.R.B. 72 (July 8, 2002). The summons also sought related work papers created by Ernst & Young in determining the adequacy of Textron's reserves that Textron might possess or could obtain. Textron again refused.

The IRS brought an enforcement action in federal district court in Rhode Island. See 26 U.S.C. § 7604(a) (2006). Textron challenged the summons as lacking legitimate purpose and also asserted, as bars to the demand, the attorney-client and tax practitioner privileges and the qualified privilege available for litigation materials under the work product doctrine. The IRS contested all of the privilege claims. Both the IRS and Textron filed affidavits and, in addition, the district court heard witnesses from both sides.[4]

---

[4]Textron's evidence came from Norman Richter, chief tax counsel and manager of Textron's Tax Department; Roxanne Cassidy, director of tax reporting; Edward Andrews, director of tax audits; Debra Raymond, vice president, taxes, of Textron Financial; and Mark Weston, a partner in Ernst & Young. IRS evidence was provided by Internal Revenue Agent Edward Vasconcellos; Professor Douglas Carmichael, former chief auditor of the regulatory body for auditors of public companies (the Public Company Accounting Oversight Board); and Gary Kane, an IRS expert on tax accrual work papers.

Textron agreed that it usually settled disputes with the IRS through negotiation or concession or at worst through the formal IRS administrative process; but it testified that sometimes it had litigated disputed tax issues in federal court. Its evidence also showed that the estimates for tax reserves and the supporting work papers were generated within its Tax Department but that tax lawyers in that department were centrally involved in their preparation and that Textron Financial also used an outside counsel to advise it on tax reserve requirements.

Textron described generically the contents of the work papers in question: these included (1) summary spreadsheets showing for each disputable item the amount in controversy, estimated probability of a successful challenge by the IRS, and resulting reserve amounts; and (2) back up e-mail and notes. In some instances the spreadsheet entries estimated the probability of IRS success at 100 percent. Textron said that the spreadsheets had been shown to and discussed with its independent auditor but physically retained by Textron.

Neither side disputed that the immediate purpose of the work papers was to establish and support the tax reserve figures for the audited financial statements. Textron's evidence was to the effect that litigation over specific items was always a possibility; the IRS did not deny that in certain cases litigation could result although it said that this was often unlikely.

Whether Textron's evidence is materially different than that of the IRS remains to be considered.

Ultimately, the district court denied the petition for enforcement. <u>United States</u> v. <u>Textron Inc.</u>, 507 F. Supp. 2d 138, 150, 155 (D.R.I. 2007). The court agreed with the IRS that the agency had a legitimate purpose for seeking the work papers. <u>Id.</u> at 145. It also ruled that insofar as the Textron-prepared work papers might otherwise be protected by attorney-client privilege, or the counterpart tax practitioner privilege for non-lawyers engaged in tax practice, <u>see</u> 26 U.S.C. § 7525 (2006), those privileges had been waived when Textron disclosed the work papers' content to Ernst & Young. <u>Id.</u> at 152.

However, the district court concluded that the papers were protected by the work product privilege, which derived from <u>Hickman</u> v. <u>Taylor</u>, 329 U.S. 495 (1947), and is now embodied in Rule 26(b)(3) of the Federal Rules of Civil Procedure. This privilege, the district court held, had not been waived by disclosure of the work papers to the accountant. <u>Textron</u>, 507 F. Supp. 2d at 152-53. The district court's decision that the work papers were protected work product involved both a description of factual premises and a legal interpretation of applicable doctrine.

The district court first said (paraphrasing a Textron witness) the work papers were prepared to assure that Textron was "adequately reserved with respect to any potential disputes or

litigation" over its returns; the court also said that, by fair inference, the work papers served "to satisfy an independent auditor that Textron's reserve for contingent liabilities satisfied the requirements of generally accepted accounting principles (GAAP) so that a 'clean' opinion would be given" for Textron financial statements. Textron, 507 F. Supp. 2d at 143.

Then, in its discussion of legal doctrine, the district court stated:

> As the IRS correctly observes, the work product privilege does not apply to "'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'" Maine, 298 F.3d at 70 (quoting [United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998)]). However, it is clear that the opinions of Textron's counsel and accountants regarding items that might be challenged by the IRS, their estimated hazards of litigation percentages and their calculation of tax reserve amounts would not have been prepared at all "but for" the fact that Textron anticipated the possibility of litigation with the IRS. . . . Thus, while it may be accurate to say that the workpapers helped Textron determine what amount should be reserved to cover any potential tax liabilities and that the workpapers were useful in obtaining a "clean" opinion from E & Y regarding the adequacy of the reserve amount, there would have been no need to create a reserve in the first place, if Textron had not anticipated a dispute with the IRS that was likely to result in litigation or some other adversarial proceeding.

Textron, 507 F. Supp. 2d at 150.

The court concluded that the work papers were therefore prepared "because of" the prospect of litigation, Textron, 507 F. Supp. 2d at 150, a phrase used in Maine v. United States Dep't of Interior, 298 F.3d 60, 68 (1st Cir. 2002). The court rejected the IRS' reliance on a Fifth Circuit decision rejecting work product protection for tax accrual work papers on the ground that the Fifth Circuit followed a different "primary purpose" test for work protect. Textron, 507 F. Supp. 2d at 150 (discussing United States v. El Paso Co., 682 F.2d 530, 543 (5th Cir. 1982), cert. denied, 466 U.S. 944 (1984)).

On appeal, a divided panel upheld the district court's decision. The en banc court then granted the government's petition for rehearing en banc, vacated the panel decision, and obtained additional briefs from the parties and interested amici. We now conclude that under our own prior Maine precedent--which we reaffirm en banc--the Textron work papers were independently required by statutory and audit requirements and that the work product privilege does not apply.

The case presents two difficulties. One, which can readily be dispelled, stems from the mutability of language used in the governing rules and a confusion between issues of fact and issues of legal characterization. The other problem is more basic: how far work product protection extends turns on a balancing of policy concerns rather than application of abstract logic; here,

-11-

two circuits have addressed tax accrual work papers in the work product context, but, apart from whatever light is cast by <u>Arthur Young</u>, the Supreme Court has not ruled on the issue before us, namely, one in which a document is not in any way prepared "for" litigation but relates to a subject that might or might not occasion litigation.

In origin, the work product privilege derives from the Supreme Court's decision in <u>Hickman</u> v. <u>Taylor</u>, 329 U.S. at 510-11, and focused at the outset on the materials that lawyers typically prepare for the purpose of litigating cases. <u>Hickman</u> v. <u>Taylor</u> concerned ongoing litigation in which one side filed interrogatories seeking from opposing counsel memoranda recording witness interviews that the latter had conducted after receiving notice of possible claims. Often such material and other items designed for use at trial (<u>e.g.</u>, draft briefs, outlines of cross examination) are not obtained from or shared with clients and are unprotected by the traditional attorney-client privilege.

<u>Hickman</u> v. <u>Taylor</u> addressed "the extent to which a party may inquire into oral and written statements of witnesses, or other information, secured by an adverse party's counsel in the course of preparation for possible litigation after a claim has arisen." 329 U.S. at 497. The Court cited a privilege in English courts protecting

> [a]ll documents which are called into existence
> for the purpose--but not necessarily the sole

purpose--of assisting the deponent or his legal advisers in any actual or anticipated litigation . . . . Reports . . . if made in the ordinary course of routine, are not privileged . . . .

Id. at 510 n. 9.

This history led the Court to practical considerations:

Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. . . . This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways-- aptly though roughly termed . . . as the "work product of the lawyer."

Id. at 511.

On this basis the Court declared that the interrogatories, which sought witness interviews conducted by opponent counsel in preparation for litigation, were protected by a qualified privilege. See id. at 511-12. When in 1970 the Supreme Court through the rule-making process codified the work product privilege in Rule 26(b)(3), it described the privilege as extending to documents and other tangible things that "are prepared in anticipation of litigation or for trial." This phrase, as illuminated by Hickman v. Taylor's reasoning, is the one to be applied in this case.

Turning back to the present case, the IRS is unquestionably right that the immediate motive of Textron in preparing the tax accrual work papers was to fix the amount of the

-13-

tax reserve on Textron's books and to obtain a clean financial opinion from its auditor. And Textron may be correct that unless the IRS might dispute an item in the return, no reserve for that item might be necessary, so perhaps some of the items might be litigated. But in saying that Textron wanted to be "adequately reserved," the district judge did not say that the work papers were prepared for use in possible litigation--only that the reserves would cover liabilities that might be determined in litigation. If the judge had made a "for use" finding--which he did not--that finding would have been clearly erroneous.

That the purpose of the work papers was to make book entries, prepare financial statements and obtain a clean audit cannot be disputed. This was the testimony of IRS expert and former Chief Auditor of the Public Company Accounting Oversight Board Douglas Carmichael:

> Q.    . . . Would you please explain what tax accrual workpapers are?
>
> A.    . . . Tax accrual workpapers really include all the support for the tax assets and liabilities shown in the financial statements . . . .
>
> A.    Well, from the company's perspective, they're created because, for example, for a public company, the key officers of the company sign a certification saying that those financial statements are fairly presented, and they need support for that.
>
> From the auditor's perspective, it's the same thing, the auditor needs to record in the workpapers what the auditor did to comply with

generally accepted auditing standards. So the workpapers are the principal support for the auditor's opinion.

Q.      And why do public companies prepare financial statements?

A.      Usually, to meet requirements for raising capital. If they're a public company, they need to file annual financial statements on a form 10K with the SEC and quarterly information on a 10Q.

The Textron witnesses, while using the word "litigation" as often as possible in their testimony, said the same thing. Textron's testimony differed from that of the IRS expert only in its further assertion that, without the possibility of litigation, no tax reserves or audit papers would have been necessary. For example, Roxanne Cassidy, Textron's director of tax reporting, testified as follows:

Q.      . . . [W]hat was Textron's purpose in preparing those tax reserve papers?

A.      The purpose primarily was to determine whether Textron was adequately reserved with respect to any potential disputes or litigations that would happen in the future. We would need to ensure that we were adequately reserved in the current year on Textron's financial statements.

. . .

Q.      And as a publicly traded company, is Textron required to file its financial statements with the Securities and Exchange Commission?

A.      Yes.

Q.    And do those financial statements include tax reserves?

A.    Yes. . . .

. . .

Q.    And in having its tax reserves audited by an independent auditor, must Textron be able to support the determinations it has made regarding the adequacy of its tax reserves with some type of evidence?

A.    Yes, the support needs to be to the satisfaction of the auditors.

As the IRS expert stated, even if litigation were "remote," the company would still have to prepare work papers to support its judgment.  Textron's own witness acknowledged that it would "have to include in its . . . tax accrual work papers any new transactions that the company entered into that year that there might be some tax exposure on" regardless of whether it anticipated likely litigation.  Judged by Textron's own experience, most--certainly those with high percentage estimates of IRS success--would never be litigated.

To complete the story, we note <u>one</u> suggestion by one Textron witness that, if litigation did occur, the work papers could be useful to Textron in that litigation.[5]  This assertion was not

---

[5]Textron Vice President of Taxes Norman Richter said that Textron would still prepare tax accrual workpapers absent GAAP requirements "[b]ecause it guides us--it's--the analysis is still--it would guide us in making litigation and settlement decisions later in the process."  This assertion was not contained in Richter's affidavit, which instead said that Textron prepared the work papers "to comply with GAAP" as required for reporting taxes

supported by any detailed explanation, was <u>not</u> adopted by the district judge and is more than dubious: the main aim of audit work papers is to estimate the amount potentially in dispute and the percentage chance of winning or losing. Even an academic supporter of Textron's legal position conceded that "it is doubtful that tax accrual workpapers, which typically just identify and quantify vulnerable return positions, would be useful in the litigation anticipated with respect to those positions." Pease-Wingenter, <u>The Application of the Attorney-Client Privilege to Tax Accrual Workpapers: The Real Legacy of United States v. Textron</u>, 8 Houston Bus. & Tax L.J. 337, 346 (2008).

Any experienced litigator would describe the tax accrual work papers as tax documents and not as case preparation materials. <u>Whether</u> work product protection should apply to such documents is a <u>legal</u> question informed by the language of rules and Supreme Court doctrine, direct precedent, and policy judgments. The first of these sources--Supreme Court doctrine and the wording of the rules-- is helpful to the IRS; direct circuit precedent and the underlying policy of the doctrine and other prudential considerations are more helpful still. Legal commentators can be found on each side; the most persuasive of them favors the IRS.[6]

_____

to the SEC, and was not supported by detail or explanation in the record.

    [6]<u>See</u> Ventry, <u>Protecting Abusive Tax Avoidance</u>, 120 Tax Notes 857, 870-83 (2008); Johnson, <u>The Work Product Doctrine and Tax</u>

From the outset, the focus of work product protection has been on materials prepared for use in litigation, whether the litigation was underway or merely anticipated.  Thus, <u>Hickman</u> v. <u>Taylor</u> addressed "the extent to which a party may inquire into oral and written statements of witnesses, or other information, secured by an adverse party's counsel <u>in the course of preparation for possible litigation</u> after a claim has arisen."  329 U.S. at 497 (emphasis added).  Similarly, the English privilege, invoked by <u>Hickman</u> v. <u>Taylor</u>, privileged "documents which are called into existence for <u>the purpose--but not necessarily the sole purpose--of assisting the deponent or his legal advisers in any actual or anticipated litigation</u>." <u>Id.</u> at 510 n. 9 (emphasis added) (internal quotation marks omitted).

The phrase used in the codified rule--"prepared in anticipation of litigation or for trial" did not, in the reference to anticipation, mean prepared for some purpose other than litigation: it meant only that the work might be done <u>for</u> litigation but <u>in advance of</u> its institution.  The English precedent, doubtless the source of the language in Rule 26, specified the purpose "of assisting the deponent or his legal advisers in any actual or anticipated litigation . . . ."  The Advisory Committee's Note cited

<u>Accrual Workpapers</u>, 124 Tax Notes 155, 160-68 (2009).  The Pease-Wingenter article, <u>supra</u>, identifies many weaknesses in the Textron argument, <u>id.</u> at 343-48, although Pease now says her own ultimate view favors Textron.

with approval a decision denying work product protection to a driver's accident report, made pursuant to Interstate Commerce Commission rules, even though it might well have become the subject of litigation. Fed. R. Civ. P. 26 advisory committee's note (1970).[7]

It is not enough to trigger work product protection that the subject matter of a document relates to a subject that might conceivably be litigated. Rather, as the Supreme Court explained, "the literal language of [Rule 26(b)(3)] protects materials prepared for any litigation or trial as long as they were prepared by or for a party to the subsequent litigation." Federal Trade Commission v. Grolier Inc., 462 U.S. 19, 25 (1983) (emphasis added). This distinction is well established in the case law. See, e.g., NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 138 (1975).[8]

---

[7]Goosman v. A. Duie Pyle, Inc., 320 F.2d 45 (4th Cir. 1963). In Goosman, the Fourth Circuit denied work product protection to reports a truck driver made to the lessee and owner of the truck following an accident. The court explained that the reports "were made in the ordinary course of business under ICC regulations and do not represent the lawyer's work product within the holding in Hickman v. Taylor." Id. at 52. See also, e.g., Calabro v. Stone, 225 F.R.D. 96, 99 (E.D.N.Y. 2004); In re Raytheon Securities Litigation, 218 F.R.D. 354, 359 (D. Mass. 2003).

[8]Accord United States v. Roxworthy, 457 F.3d 590, 595 (6th Cir. 2006) ("Nevertheless, the key issue in determining whether a document should be withheld is the function that the document serves."); Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 858 (D.C. Cir. 1980) (same); Church of Scientology Int'l v. IRS, 845 F. Supp. 714, 723 (C.D. Cal. 1993) ("The Ninth Circuit test focuses on the function of a document as part of the deliberative process rather than on the contents of the document.").

Nor is it enough that the materials were prepared by lawyers or represent legal thinking. Much corporate material prepared in law offices or reviewed by lawyers falls in that vast category. It is only work done in anticipation of or for trial that is protected. Even if prepared by lawyers and reflecting legal thinking, "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." Fed. R. Civ. P. 26 advisory committee's note (1970). Accord Hickman v. Taylor, 329 U.S. at 510 n. 9 (quoting English precedent that "[r]eports . . . if made in the ordinary course of routine, are not privileged").

Every lawyer who tries cases knows the touch and feel of materials prepared for a current or possible (i.e., "in anticipation of") law suit. They are the very materials catalogued in Hickman v. Taylor and the English precedent with which the decision began. No one with experience of law suits would talk about tax accrual work papers in those terms. A set of tax reserve figures, calculated for purposes of accurately stating a company's financial figures, has in ordinary parlance only that purpose: to support a financial statement and the independent audit of it.

Focusing next on direct precedent, work product protection for tax audit work papers has been squarely addressed only in two circuits: this one and the Fifth. In Maine, we said that work

product protection does not extend to "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." Maine, 298 F.3d at 70 (quoting United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998)) (internal quotation marks omitted).  Maine applies straightforwardly to Textron's tax audit work papers--which were prepared in the ordinary course of business--and it supports the IRS position.

Similarly, the Fifth Circuit in El Paso denied protection for the work papers because the court recognized that the company in question was conducting the relevant analysis because of a need to "bring its financial books into conformity with generally accepted auditing principles."  682 F.2d at 543.  The Fifth Circuit, which employs a "primary purpose" test, found that the work papers' "sole function" was to back up financial statements.  Id. at 543-44. Here, too, the only purpose of Textron's papers was to prepare financial statements.

Other circuits have not passed on tax audit work papers and some might take a different view.  But many of the debatable cases affording work product protection involve documents unquestionably prepared for potential use in litigation if and when it should arise.[9]  There is no evidence in this case that the work

_____

[9]See, e.g., Delaney, Migdail & Young, Chartered v. IRS, 826 F.2d 124, 127 (D.C. Cir. 1987) (protection for "attorneys' assessment of . . . legal vulnerabilities in order to make sure it

-21-

papers were prepared for such a use or would in fact serve any useful purpose for Textron in conducting litigation if it arose.

Finally, the underlying prudential considerations squarely support the IRS' position in this case, and such considerations have special force because Hickman v. Taylor was the child of such considerations, as the quotations above make clear. The privilege aimed centrally at protecting the litigation process, Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 864 (D.C. Cir. 1980), specifically, work done by counsel to help him or her in litigating a case. It is not a privilege designed to help the lawyer prepare corporate documents or other materials prepared in the ordinary course of business. Where the rationale for a rule stops, so ordinarily does the rule.

Nor is there present here the concern that Hickman v. Taylor stressed about discouraging sound preparation for a law suit. That danger may exist in other kinds of cases, but it cannot be present where, as here, there is in substance a legal obligation to prepare such papers: the tax audit work papers not only have a different purpose but have to be prepared by exchange-listed companies to comply with the securities laws and accounting principles for certified financial statements. Arthur Young made

_____

does not miss anything in crafting its legal case"); see also In re Sealed Case, 146 F.3d 881, 885 (D.C. Cir. 1998) (protection for documents to "protect the client from future litigation about a particular transaction").

this point in refusing to create an accountant's work product privilege for tax audit papers:

> [T]he auditor is ethically and professionally obligated to ascertain for himself as far as possible whether the corporation's contingent tax liabilities have been accurately stated. . . . Responsible corporate management would not risk a qualified evaluation of a corporate taxpayer's financial posture to afford cover for questionable positions reflected in a prior tax return.

465 U.S. at 818-19; see also Johnson, supra, at 160-61.

Textron apparently thinks it is "unfair" for the government to have access to its spreadsheets, but tax collection is not a game. Underpaying taxes threatens the essential public interest in revenue collection. If a blueprint to Textron's possible improper deductions can be found in Textron's files, it is properly available to the government unless privileged. Virtually all discovery against a party aims at securing information that may assist an opponent in uncovering the truth. Unprivileged IRS information is equally subject to discovery.[10]

The practical problems confronting the IRS in discovering under-reporting of corporate taxes, which is likely endemic, are serious. Textron's return is massive--constituting more than 4,000 pages--and the IRS requested the work papers only after finding a

---

[10]See Abel Inv. Co. v. United States, 53 F.R.D. 485, 488 (D. Neb. 1971) (holding that IRS documents created during an audit were not protected work product, despite containing attorneys' mental impression and legal theories, because an IRS audit is not litigation).

-23-

specific type of transaction that had been shown to be abused by taxpayers. It is because the collection of revenues is essential to government that administrative discovery, along with many other comparatively unusual tools, are furnished to the IRS.

As Bentham explained, all privileges limit access to the truth in aid of other objectives, 8 Wigmore, Evidence § 2291 (McNaughton Rev. 1961), but virtually all privileges are restricted--either (as here) by definition or (in many cases) through explicit exceptions--by countervailing limitations. The Fifth Amendment privilege against self-incrimination is qualified, among other doctrines, by the required records exception, see Grosso v. United States, 390 U.S. 62, 67-68 (1968), and the attorney client privilege, along with other limitations, by the crime-fraud exception, see Clark v. United States, 289 U.S. 1, 15 (1933).

To sum up, the work product privilege is aimed at protecting work done for litigation, not in preparing financial statements. Textron's work papers were prepared to support financial filings and gain auditor approval; the compulsion of the securities laws and auditing requirements assure that they will be carefully prepared, in their present form, even though not protected; and IRS access serves the legitimate, and important, function of detecting and disallowing abusive tax shelters.

The judgment of the district court is <u>vacated</u> and the case is <u>remanded</u> for further proceedings consistent with this decision.

It is so ordered.


<u>Dissent follows</u>.

**TORRUELLA**, Circuit Judge, with whom **LIPEZ**, Circuit Judge, joins, **Dissenting.** To assist the IRS in its quest to compel taxpayers to reveal their own assessments of their tax returns, the majority abandons our "because of" test, which asks whether "'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'" Maine v. United States Dep't of the Interior, 298 F.3d 60, 68 (1st Cir. 2002) (emphasis in original) (quoting United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998)). The majority purports to follow this test, but never even cites it. Rather, in its place, the majority imposes a "prepared for" test, asking if the documents were "prepared for use in possible litigation." Maj. Op. at 13. This test is an even narrower variant of the widely rejected "primary motivating purpose" test used in the Fifth Circuit and specifically repudiated by this court. In adopting its test, the majority ignores a tome of precedents from the circuit courts and contravenes much of the principles underlying the work-product doctrine. It also brushes aside the actual text of Rule 26(b)(3), which "[n]owhere . . . state[s] that a document must have been prepared to aid in the conduct of litigation in order to constitute work product." Adlman, 134 F.3d at 1198. Further, the majority misrepresents and ignores the findings of the district court. All while purporting to do just the opposite of what it actually does.

-26-

## I. **The Majority Quietly Rejects Circuit Precedent**

The majority claims allegiance to our prior decision in Maine, 298 F.3d at 70. Specifically, the majority seizes upon a single line from that decision: "the 'because of' standard does not protect from disclosure 'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'" Id. (quoting Adlman, 134 F.3d at 1202). This qualification is important to be sure, and I will address it infra, Section III.B.2. But I must start by addressing the rest of the Maine decision, which the majority is careful to ignore.

In that decision, Maine sought documents prepared by the Department of the Interior regarding its decision, made during pending related litigation, to classify salmon as a protected species. Id. at 64. The district court found some of these administrative documents unprotected as the Department had not shown that litigation preparation was "'the primary motivating factor for the preparation of the documents.'" Id. at 66-67. This formulation of the test for "anticipation of litigation" was based on the Fifth Circuit rule that the work-product doctrine did not protect documents that were "not primarily motivated to assist in future litigation." United States v. El Paso, 682 F.2d 530, 542-43 (5th Cir. 1982) (emphasis added) (citing United States v. Davis, 636 F.2d 1028, 1040 (5th Cir. 1981)). On appeal in Maine, we specifically

-27-

repudiated this test and adopted the broader "because of" test, which had been thoughtfully and carefully explained by Judge Leval in the Second Circuit decision in Adlman, 134 F.3d at 1202-03.  See Maine, 298 F.3d at 68 ("In light of the decisions of the Supreme Court, we therefore agree with the formulation of the work-product rule adopted in Adlman and by five other courts of appeals.").

In the present case, the majority purports to follow Maine, but really conducts a new analysis of the history of the work-product doctrine and concludes that documents must be "'prepared for any litigation or trial.'"  Maj. Op. at 18 (emphasis in original) (quoting FTC v. Grolier Inc., 462 U.S. 19, 25 (1983)).  Similarly, at another point, the majority suggests that documents must be "for use" in litigation in order to be protected.  Id. at 13.  Grolier did not establish such a test and the majority can point to no court that has so ruled.[11]  Rather, the majority of

_____

[11]To support its conclusion, the majority commits a plain logical error.  The majority states that work-product protection must not be judged solely on its subject matter, but rather whether the documents's purpose is for use in litigation.  In support of this proposition, the majority cites a number of cases that propound the uncontroversial proposition that a document must be judged according to its purpose, not solely its content. Maj. Op. at 18 n.8.  But those cases do not establish the majority's rule that the documents' purpose must be limited to use in litigation. Rather, one of the cases the majority cites adopts the test that the document must have been created "because of" litigation, which, as Adlman describes, is antithetical to the majority's new requirement.  United States v. Roxworthy, 457 F.3d 590, 593-94 (6th Cir. 2006) (adopting Adlman's "because of" test).  Another of the majority's citations is from the D.C. Circuit, which has also since adopted the "because of" test.  Senate of Puerto Rico v. United States Dep't of Justice, 823 F.2d 574, 587 n.42 (D.C. Cir. 1987).

-28-

circuit courts, led by the Second Circuit's decision in <u>Adlman</u>, have rejected such a rule.

<u>Adlman</u>'s articulation of the "because of" test is fatal to the majority's position. In that case, Judge Leval discussed the application of the work-product doctrine "to a litigation analysis prepared by a party or its representative in order to inform a business decision which turns on the party's assessment of the likely outcome of litigation expected to result from the transaction." <u>Adlman</u>, 134 F.3d at 1197. In other words, <u>Adlman</u> asked whether the work-product doctrine applies where a dual purpose exists for preparing the legal analysis, that is, where the dual purpose of anticipating litigation and a business purpose co-exist. To answer that question, the <u>Adlman</u> court examined and rejected the "primary purpose" test adopted by the Fifth Circuit in <u>El Paso</u>, 682 F.2d at 542-43, which only grants work-product immunity to workpapers prepared "primarily motivated to assist in future litigation over the return," <u>id.</u> at 543:

> [Protection] is less clear, however, as to documents which, although prepared because of expected litigation, are intended to inform a business decision influenced by the prospects of the litigation. The formulation applied by

The final decision cited by the majority, from the Northern District of California, deals with the deliberative process privilege, not the work-product doctrine. <u>Church of Scientology Int'l</u> v. <u>IRS</u>, 845 F. Supp. 714, 723 (C.D. Cal. 1993). In any event, the Ninth Circuit also applies the "because of" test. <u>In re Grand Jury Subpoena</u>, 357 F.3d 900, 907-08 (9th Cir. 2004) (praising and following <u>Adlman</u>).

-29-

some courts in determining whether documents are protected by work-product privilege is whether they are prepared "primarily or exclusively to assist in litigation" -- a formulation that would potentially exclude documents containing analysis of expected litigation, if their primary, ultimate, or exclusive purpose is to assist in making the business decision. Others ask whether the documents were prepared "because of" existing or expected litigation -- a formulation that would include such documents, despite the fact that their purpose is not to "assist in" litigation. Because we believe that protection of documents of this type is more consistent with both the literal terms and the purposes of the Rule, we adopt the latter formulation.

Adlman, 134 F.3d at 1197-98, quoted in part in Maine, 298 F.3d at 68. And if it needs to be spelled out any more clearly, Adlman makes it explicitly clear that the broader "because of" formulation is not limited to documents prepared for use in litigation:

We believe that a requirement that documents be produced primarily or exclusively to assist in litigation in order to be protected is at odds with the text and the policies of the Rule. Nowhere does Rule 26(b)(3) state that a document must have been prepared to aid in the conduct of litigation in order to constitute work product, much less primarily or exclusively to aid in litigation. Preparing a document "in anticipation of litigation" is sufficient.

The text of Rule 26(b)(3) does not limit its protection to materials prepared to assist at trial. To the contrary, the text of the Rule clearly sweeps more broadly. It expressly states that work-product privilege applies not only to documents "prepared . . . for trial" but also to those prepared "in anticipation of litigation." If the drafters of the Rule intended to limit its protection to documents made to assist in preparation for litigation,

-30-

> this would have been adequately conveyed by the phrase "prepared . . . for trial." The fact that documents prepared "in anticipation of litigation" were also included confirms that the drafters considered this to be a different, and broader category. Nothing in the Rule states or suggests that documents prepared "in anticipation of litigation" with the purpose of assisting in the making of a business decision do not fall within its scope.

Id. at 1198-99 (emphasis and alterations in original). Rather than confront this language, the majority resorts to simplistic generalizations. Using its novel "prepared for" test, the majority unhelpfully explains that "[e]very lawyer who tries cases knows the touch and feel of materials prepared for a current or possible . . . law suit." Maj. Op. at 19. Once the majority ignores decades of controlling precedent, the matter becomes so clear that "[n]o one with experience of law suits" could disagree. Id.

I need say little else; the majority's new "prepared for" rule is blatantly contrary to Adlman, a leading case interpreting the work-product doctrine that we specifically adopted in Maine. The majority's opinion is simply stunning in its failure to even acknowledge this language and its suggestion that it is respecting rather than overruling Maine.

## II. The Majority's Announces a Bad Rule

The majority acts as if it is left to this court to draw a line from Hickman to the present case. In so doing, the majority ignores a host of cases which grapple with tough work product questions that go beyond the stuff that "[e]very lawyer who tries

cases" would know is work product. Lower courts deserve more guidance than a simple reassurance that a bare majority of the en banc court knows work product when it sees it.[12] Of course, since this is an en banc proceeding, the majority is free to create a new rule for the circuit -- though it would be better if it admitted that it was doing so. But our new circuit rule is not even a good rule.

First, as Judge Leval observed in Adlman, a "prepared for" requirement is not consistent with the plain language of Federal Rule of Civil Procedure 26, which provides protection for documents "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3)(A) (emphasis added); see also Adlman, 134 F.3d at 1198-99. There is no reason to believe that "anticipation of litigation" was meant as a synonym for "for trial." Claudine Pease-Wingenter, Prophetic or Misguided? The Fifth Circuit's (Increasingly) Unpopular Approach to the Work Product Doctrine, 29 Rev. Litig. (forthcoming

---

[12]This test is reminiscent of Justice Stewart's famously unhelpful test for identifying obscenity:

> [C]riminal laws in this area are constitutionally limited to hard-core pornography. I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.

Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

2009) (analyzing and rejecting many of the arguments advanced by the majority in favor of a narrow construction of the phrase "anticipation of litigation").  Since the terms are not synonymous, the term "anticipation of litigation" should not be read out of the rule by requiring a showing that documents be prepared for trial.  See Carcieri v. Salazar, 129 S. Ct. 1058, 1066 (2009) (discussing the basic principle that statutes should be construed to give effect to each word).

Second, though the majority goes into some depth describing the foundational case of Hickman v. Taylor, 329 U.S. 495 (1947), it misses the fundamental concern of that decision with protecting an attorney's "privacy, free from unnecessary intrusion by opposing parties and their counsel."  Id. at 510.  Without such privacy, litigants would seek unfair advantage by free-riding off another's work, thus reducing lawyers' ability to write down their thoughts:

> Were the attorney's work accessible to an adversary, the Hickman court cautioned, "much of what is now put down in writing would remain unwritten" for fear that the attorney's work would redound to the benefit of the opposing party.  Legal advice might be marred by "inefficiency, unfairness and sharp practices," and the "effect on the legal profession would be demoralizing."  Neither the interests of clients nor the cause of justice would be served, the court observed, if work product were freely discoverable.

Adlman, 134 F.3d at 1197 (quoting Hickman, 329 U.S. at 511) (citations omitted).  The majority posits that these rationales do

not apply to documents containing a lawyer's legal analysis of a potential litigation, if that analysis was prepared for a business purpose.  Maj. Op. at 21.  This is both unpersuasive and directly contrary to the policy analysis in Adlman, which we adopted in Maine.  Adlman identified an example of a protected document:

> A business entity prepares financial statements to assist its executives, stockholders, prospective investors, business partners, and others in evaluating future courses of action. Financial statements include reserves for projected litigation. The company's independent auditor requests a memorandum prepared by the company's attorneys estimating the likelihood of success in litigation and an accompanying analysis of the company's legal strategies and options to assist it in estimating what should be reserved for litigation losses.

Id. at 1200.  Discussing this example, the court concluded that in this scenario "the company involved would require legal analysis that falls squarely within Hickman's area of primary concern -- analysis that candidly discusses the attorney's litigation strategies, appraisal of likelihood of success, and perhaps the feasibility of reasonable settlement."  Id.  Further, there is "no basis for adopting a test under which an attorney's assessment of the likely outcome of litigation is freely available to his litigation adversary merely because the document was created for a business purpose rather than for litigation assistance."  Id.  In other words,

> [i]n addition to the plain language of the Rule, the policies underlying the work-product

-34-

doctrine suggest strongly that work-product protection should not be denied to a document that analyzes expected litigation merely because it is prepared to assist in a business decision. Framing the inquiry as whether the primary or exclusive purpose of the document was to assist in litigation threatens to deny protection to documents that implicate key concerns underlying the work-product doctrine.

Id. at 1199; see also Roxworthy, 457 F.3d at 595 (stating "the IRS would appear to obtain an unfair advantage by gaining access to KPMG's detailed legal analysis of the strengths and weaknesses of [the taxpayer's] position. This factor weighs in favor of recognizing the documents as privileged.").

The majority offers no response to this sound policy analysis and no reason to doubt that inefficiency and "sharp practices" will result from its new rule allowing discovery of such dual purpose documents, which contain confidential assessments of litigation strategies and chances. Instead of addressing these concerns, the majority's policy analysis relies instead on case-specific rationales -- namely the need to assist the IRS in its difficult task of reviewing Textron's complex return. See Maj. Op. at 22-23. Such outcome determinative reasoning is plainly unacceptable. Thus, properly framed, it is clear that the rationales underlying the work-product doctrine apply to documents

prepared in anticipation of litigation, even if they are not also for use at trial.[13]

And these policy rationales are squarely implicated in this case. First, Textron's litigation hazard percentages contain exactly the sort of mental impressions about the case that Hickman sought to protect. In fact, these percentages contain counsel's ultimate impression of the value of the case. Revealing such impressions would have clear free-riding consequences. With this information, the IRS will be able to immediately identify weak spots and know exactly how much Textron should be willing to spend to settle each item. Indeed, the IRS explicitly admits that this is its purpose in seeking the documents.

Second, as argued to us by amici, the Chamber of Commerce of the United States and the Association of Corporate Counsel, if attorneys who identify good faith questions and uncertainties in their clients' tax returns know that putting such information in writing will result in discovery by the IRS, they will be more likely to avoid putting it in writing, thus diminishing the quality of representation. The majority dismisses such concerns, concluding

---

[13]Perhaps because of these very same concerns about privacy and fairness, the IRS itself argued for the protection of its documents prepared for the dual purposes of helping the IRS understand the litigation risks that might result if the IRS made the administrative decision to adopt a new program. Delaney, Migdail & Young, Chartered v. IRS, 826 F.2d 124 (D.C. Cir. 1987). This point was also noted by the Adlman court when it observed that "the IRS successfully argued against the very position it here advocates." Adlman, 134 F.3d at 1201.

that tax accrual workpapers are required by law. Maj. Op. at 21. But the majority fails to cite the record for this conclusion, likely because the majority is simply wrong. As the majority opinion earlier admits, Maj Op. at 2-3, the law only requires that Textron prepare audited financial statements reporting total reserves based on contingent tax liabilities. Accounting standards require some evidential support before such statements can be certified, but do not explicitly require the form and detail of the documents prepared here by Textron's attorneys with respect to each potentially challenged tax item. See also Michelle M. Henkel, Textron: The Debate Continues as to Whether Auditor Transparency Waives the Work Product Privilege, 50 Tax Management Memorandum 251, 260 (2009) (distinguishing auditor's workpapers and corporate workpapers and explaining that the latter are not mandatory but serve to evaluate a company's litigation risks). Rather, all that must be actually reported is the final tax reserve liability amount. Thus, as amicii worry, the majority's new rule will have ramifications that will affect the form and detail of documents attorneys prepare when working to convince auditors of the soundness of a corporation's reserves.

These concerns are even more clearly implicated in this case because the majority's decision will remove protection for Textron's "backup materials" as well as its actual workpapers. The district court found that these materials included "notes and

memoranda written by Textron's in-house tax attorneys reflecting their opinions as to which items should be included on the spreadsheet and the hazard of litigation percentage that should apply to each item." United States v. Textron Inc., 507 F. Supp. 2d 138, 143 (D.R.I. 2007). Thus, these documents thus go beyond the numbers used to compute a total reserve. Rather, they explain the legal rationale underpinning Textron's views of its litigation chances. The majority fails to acknowledge this subtlety, explain why it views such documents as required by regulatory rules, or explain why such mental impressions should go unprotected. Exposing such documentation to discovery is a significant expansion of the IRS's power and will likely reveal information far beyond the basic numbers that the IRS could discover through production of Textron's auditor's workpapers.

But more important are the ramifications beyond this case and beyond even the case of tax accrual workpapers in general. The scope of the work-product doctrine should not depend on what party is asserting it. Rather, the rule announced in this case will, if applied fairly, have wide ramifications that the majority fails to address.

For example, as the IRS explicitly conceded at oral argument, under the majority's rule one party in a litigation will be able to discover an opposing party's analysis of the business risks of the instant litigation, including the amount of money set

aside in a litigation reserve fund, created in accordance with similar requirements as Textron's tax reserve fund. Though this consequence was a major concern of the argument in this case, the majority does not even consider this "sharp practice," which its new rule will surely permit.

And there are plenty more examples. Under the majority's rule, there is no protection for the kind of documents at issue in Adlman, namely "documents analyzing anticipated litigation, but prepared to assist in a business decision rather than to assist in the conduct of the litigation." 134 F.3d at 1201-02. Nearly every major business decision by a public company has a legal dimension that will require such analysis. Corporate attorneys preparing such analyses should now be aware that their work product is not protected in this circuit.

### III. <u>The Workpapers Are Protected Under the Right Test</u>

Applying the "because of" test thoughtfully adopted in Adlman and Maine, the majority should have concluded that Textron's workpapers are protected by the work-product doctrine. The proper starting point in reaching this legal conclusion should be the factual findings of the district court, which held an evidentiary hearing to understand the nature of the documents sought here by the IRS.

## A. Factual findings

After considering affidavits and testimony, the district court found that the tax accrual workpapers are:

> 1. A spreadsheet that contains:
> (a) lists of items on Textron's tax returns, which, in the opinion of Textron's counsel, involve issues on which the tax laws are unclear, and, therefore, may be challenged by the IRS;
> (b) <u>estimates by Textron's counsel expressing, in percentage terms, their judgments regarding Textron's chances of prevailing in any litigation over those issues (the "hazards of litigation percentages")</u>; and
> (c) the dollar amounts reserved to reflect the possibility that Textron might not prevail in such litigation (the "tax reserve amounts").

<u>Textron</u>, 507 F. Supp. 2d at 142-143 (emphasis added). These workpapers do not contain any facts about the transactions that concerned the IRS. <u>Id.</u> at 143.

The district court also found, "[a]s stated by Norman Richter, Vice President of Taxes at Textron and Roxanne Cassidy, Director, Tax Reporting at Textron, Textron's ultimate purpose in preparing the tax accrual workpapers was to ensure that Textron was 'adequately reserved with respect to any potential disputes or litigation that would happen in the future.'" <u>Id.</u> at 143. Further, "there would have been no need to create a reserve in the first place, if Textron had not anticipated a dispute with the IRS that was likely to result in litigation or some other adversarial proceeding." <u>Id.</u> at 150.

In addition to recognizing these litigation purposes, the district court also recognized the dual purposes driving the creation of these documents and found that the workpapers' creation "also was prompted, in part" by the need to satisfy Textron's auditors and get a "clean" opinion letter. Id. at 143. The district court later clarified:

> Thus, while it may be accurate to say that the workpapers helped Textron determine what amount should be reserved to cover any potential tax liabilities and that the workpapers were useful in obtaining a "clean" opinion from [the auditor] regarding the adequacy of the reserve amount, there would have been no need to create a reserve in the first place, if Textron had not anticipated a dispute with the IRS that was likely to result in litigation or some other adversarial proceeding.

Id. at 150. Relatedly, the district court found that anticipation of litigation was the "but for" cause of the documents' creation. Id. Thus, the district court clearly found two purposes leading to the creation of the workpapers.

The majority makes no effort to reject these factual findings, but simply recharacterizes the facts as suits its purposes. For example, the majority declares, without reference to the district court's more nuanced findings, that the "the IRS is unquestionably right that the immediate motive of Textron in preparing the tax accrual work papers was to fix the amount of the tax reserve on Textron's books and to obtain a clean financial opinion from its auditor." Maj. Op. at 12-13. At another point,

-41-

the majority boldly pronounces, "the only purpose of Textron's papers was to prepare financial statements." Id. at 20. Of course, as explained above, the district court's factual findings about Textron's "ultimate purpose" were directly contrary to these pronouncements. Discarding a district court's factual finding on causation without any demonstration of clear error is not within this court's proper appellate function. See Fed. R. Civ. P. 52(a) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."); see also Constructora Maza, Inc. v. Banco de Ponce, 616 F.2d 573, 576 (1st Cir. 1980) (noting that clear error review applies even when "much of the evidence is documentary and the challenged findings are factual inferences drawn from undisputed facts").

Instead, the majority exalts in the fact that the district court made no finding that the documents were "for use in possible litigation." Maj. Op. at 13. That proposition is true. But, as described above, "for use" (i.e. "prepared for") is not and has never been the law of this circuit.

The majority does suggest that the documents business purpose "cannot be disputed." Id. This is also uncontroversial. The district court found both a litigation and a business purpose. But, in straining to ignore the documents' litigation purposes, the

-42-

majority proceeds to rely heavily on the IRS's expert. In so doing, the majority makes no effort to explain why the district court should have been required to adopt the view that the workpapers existed only for a non-litigation purpose. The majority claims that Textron's witnesses agreed with the IRS expert, but the majority fails to reconcile this proclamation with the competing view of Textron's witnesses, which the district court explicitly relied upon in its factual findings regarding Textron's "ultimate purpose." Textron, 507 F. Supp. 2d at 143. This is another corruption of the proper role of an appellate court. See Anderson v. Bessemer City, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

The majority does suggest that the district court's findings regarding the cause of the workpapers' creation was only stated in its legal analysis section. Maj. Op. at 9. But the actual purpose of the documents' creators, or, in the words of the district court, "but-for" causation, is a factual issue, and the majority makes no effort to explain why such issue should be reviewed as a legal conclusion.

The majority also proclaims, without record support, that "[a]ny experienced litigator would describe the tax accrual work papers as tax documents and not as case preparation materials." Maj. Op. at 16. As described above, this conclusion reverses,

-43-

without any finding of clear error, the district court's factual findings. Further, this language dangerously suggests that this court can, from its general knowledge, offer an expert opinion as to how such documents are always seen by "experienced litigators." Another of the many errors of this approach is revealed by reference to undisputed record testimony. Namely, the majority's assumption that tax accrual workpapers are a uniform class from corporation to corporation is simply wrong. When the district court carefully and specifically defined what documents were actually at issue in this case, it explained that "there is no immutable definition of the term 'tax accrual papers,'" and that their content varies from case to case, Textron, 507 F. Supp. 2d at 142, a conclusion that is consonant with the testimony of the government's expert. Id. at 142 n.2. Thus, even were it not our rule that we defer to the district court's factfinding, such a rule would make good sense in handling the wide range of workpapers likely to confront district courts in the future as the IRS increasingly seeks their discovery.

Even if we looked at the purpose of tax accrual workpapers as a general matter, the district court's conclusion that Textron's anticipation of litigation drove its reporting obligations is not so outrageous as to leave us with a firm conviction of error. Rather, other courts reviewing similar kinds of documents have reached similar conclusions. Regions Fin. Corp. & Subsidiaries v. United States, No. 2:06-CV-00895-RDP, 2008 WL 2139008, at *6 (N.D.

Ala. May 8, 2008) (concluding, in examining another company's workpapers that "[w]ere it not for anticipated litigation, Regions would not have to worry about contingent liabilities and would have no need to elicit opinions regarding the likely results of litigation"); Comm'r of Revenue v. Comcast Corp., 901 N.E.2d 1185, 1191, 1205 (Mass. 2009) (affirming a finding of work-product protection for a business memorandum analyzing the "pros and cons of the various planning opportunities and the attendant litigation risks" since the author "had 'the prospect of litigation in mind when it directed the preparation of the memorandum'" and would not have been prepared irrespective of that litigation (quoting Adlman, 134 F.3d at 1204)).

## B. Analysis

This court should accept the district court's factual conclusion that Textron created these documents for the purpose of assessing its chances of prevailing in potential litigation over its tax return in order to assess risks and reserve funds. Under these facts, work-product protection should apply.

### 1. The "because of" test

First, the majority does not develop any analysis contesting the proposition that disputes with the IRS in an audit can constitute litigation, within the meaning of Fed. R. Civ. P. 26(b)(3)(A). Indeed, such a conclusion is clear. For these purposes, the touchstone of "litigation" is that it is adversarial.

See Restatement (Third) of the Law Governing Lawyers § 87 cmt. h (2000). Though the initial stages of a tax audit may not be adversarial, the disputes themselves are essentially adversarial; the subject of these disputes will become the subject of litigation unless the dispute is resolved.

Applying the "because of" test as articulated in Adlman and Maine, the workpapers are protected. Under these precedents, a document is protected if, "'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'" Maine, 298 F.3d at 68 (emphasis in original) (quoting Adlman, 134 F.3d at 1202). The "because of" test "really turns on whether [the document] would have been prepared irrespective of the expected litigation with the IRS." Adlman, 134 F.3d at 1204. As the district court found, the driving force behind the preparation of the documents was the need to reserve money in anticipation of disputes with the IRS. Textron, 507 F. Supp. 2d at 143. Though other business needs also contributed to Textron's need to create the documents, those needs depended on Textron's anticipating litigation with the IRS. In other words, without the anticipation of litigation, there would be no need to estimate a reserve to fund payment of tax disputes. Id. at 150. In this way, the dual purposes leading to the documents' creation were intertwined, and work-product protection should apply. See In re

-46-

Grand Jury Subpoena, 357 F.3d at 910 ("The documents are entitled to work product protection because, taking into account the facts surrounding their creation, their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole."); see also Andrew Golodny, Note: Lawyers versus Auditors: Disclosure to Auditors and Potential Waiver of Work-Product Privilege in United States v. Textron, 61 Tax Law. 621, 629 (2008) ("As a commentator noted, 'in the case of tax contingency reserves, the prospect of future litigation and the business need for the documents are so intertwined that the prospect of future litigation itself creates the business need for the document.'" (quoting Terrence G. Perris, Court Applies Work Product Privilege to Tax Accrual Workpapers, 80 Prac. Tax. Strategies 4 (2008))).

The majority simply refuses to accept the district court's finding that the documents would not exist but for Textron's need to anticipate litigation. This rejection is essential to the majority's erroneous conclusion. Accepting the district court's findings regarding purpose compels a finding of work-product protection, since the precedents are clear that under the "because of" test, dual purpose documents are protected. In fact, that is one of the very reasons some courts have adopted the test. 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure, § 2024 (2d ed. 2009) ("'Dual purpose'

-47-

documents created because of the prospect of litigation are protected even though they were also prepared for a business purpose."); see also Roxworthy, 457 F.3d at 598-99 ("[D]ocuments do not lose their work product privilege 'merely because [they were] created in order to assist with a business decision,' unless the documents 'would have been created in essentially similar form irrespective of the litigation.'" (quoting Adlman, 134 F.3d at 1202)); In re Grand Jury Subpoena, 357 F.3d at 907 (adopting Wright and Miller's "because of" test in order to handle "dual purpose" documents); Maine, 298 F.3d at 68 (adopting Adlman after recounting the distinction between the "because of" test and the "primary purpose" test in their handling of dual purpose documents); Adlman, 134 F.3d at 1197-98, 1202 ("Where a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection under this formulation merely because it is created in order to assist with a business decision."); In re Special Sept. 1978 Grand Jury (II), 640 F.2d 49, 61 (7th Cir. 1980) ("We conclude that the materials . . . were indeed prepared in anticipation of litigation, even though they were prepared as well for the filing of the Board of Elections reports.").

## 2.  **The exception to the "because of" test**

The majority reads too much into one sentence from <u>Maine</u> and <u>Adlman</u>.  Specifically, it is true that "the 'because of' standard does not protect from disclosure 'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.'"  <u>Maine</u>, 298 F.3d at 70 (quoting <u>Adlman</u>, 134 F.3d at 1202).  This proviso relates to the advisory notes to the rule, which excludes from protection "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes." Fed. R. Civ. P. 26 advisory committee's note (1970).  Understood in light of the fact that the "because of" test unequivocally protects "dual purpose" documents, this proviso does not strip protection for dual purpose documents that have one business or regulatory purpose. Rather, the best reading of the advisory committee's note is simply that preparation for business or for public requirements is preparation for a nonlitigation purpose insufficient in itself to warrant protection.  The note states that there is no protection for documents created for business, regulatory, or "other nonlitigation purposes."  This language suggests the note is considering business and regulatory purposes as nonlitigation purposes, but does not suggest that the presence of such a purpose should somehow override a litigation purpose, should one exist.  Thus, correctly formulated,

-49-

this exception should be understood as simply clarifying the rule that dual purpose documents are protected, though "there is no work-product immunity for documents prepared in the regular course of business <u>rather than</u> for purposes of the litigation." Wright & Miller, <u>supra</u>, § 2024 (emphasis added); <u>see also</u> <u>Roxworthy</u>, 457 F.3d at 599 ("[A] document can be created for both use in the ordinary course of business and in anticipation of litigation without losing its work-product privilege."). Under the majority's interpretation, the exception swallows the rule protecting dual purpose documents.

So understood, the exception does not control this case. After citing this exception, the district court concluded that the documents were not created irrespective of litigation because Textron would not have prepared the documents but for the anticipation of litigation. <u>Textron</u>, 507 F. Supp. 2d at 150. The majority makes no effort to label this finding clearly erroneous. To the contrary, the finding is correct. The tax accrual workpapers identify specific tax line items, and then anticipate the likelihood that litigation over those items will result in Textron having to pay the IRS more money. That Textron will not ultimately litigate each position does not change the fact that when it prepared the documents, Textron was acting to anticipate and analyze the consequences of possible litigation, just like the memorandum example in <u>Adlman</u>, 134 F.3d at 1200. The documents would not be the same at all had Textron not anticipated litigation. So, under the

-50-

"because of" test, as applied in <u>Adlman</u> and the many circuit courts that have followed it, these documents were not prepared "irrespective" of the prospect of litigation. They should be protected.

### 3.  **<u>Arthur Young</u> and <u>El Paso</u> do not control**

Neither the Supreme Court's decision in <u>United States</u> v. <u>Arthur Young & Co.</u>, 465 U.S. 805 (1984), nor the Fifth Circuit's decision in <u>El Paso</u>, 682 F.2d at 530, support a different result.

In <u>Arthur Young</u>, the Court declined to recognize an accountant's work-product doctrine, thus holding that tax accrual workpapers created by an independent auditor were not protected. <u>Arthur Young</u>, 465 U.S. at 815-21. But unlike the Court in <u>Arthur Young</u>, we are not now confronted with the question of whether to recognize a new privilege. Here, the doctrinal decision we face is how to apply existing work-product doctrine to the present facts, in other words whether the "because of" test protects dual purpose documents, as the <u>Maine</u> and <u>Adlman</u> courts so held. This question was not at all presented in <u>Arthur Young</u>.

On the other hand, <u>El Paso</u> is clearly factually on point -- there the Fifth circuit rejected work-product protection for similar tax accrual workpapers. <u>El Paso</u>, 682 F.2d at 542. But, as explained above, that court applied a different definition of the work-product doctrine, asking whether the "primary motivating purpose behind the creation of the document was to aid in possible

future litigation." Id. at 542-44 (concluding that the document should not be protected as it "carries much more the aura of daily business than it does of courtroom combat"). Finding Textron's workpapers protected would not create a circuit split, but be merely an application of a widely acknowledged existing difference between our law and the law of the Fifth Circuit. It is precisely in these "dual purpose" situations that the "because of" test used in this circuit is meant to distinguish itself from the "primary purpose" test used in the Fifth Circuit. Maine, 298 F.3d at 68 (citing Adlman for the proposition that the primary purpose test "is at odds with the text and the policies of Rule 26 because nothing in it suggests that documents prepared for dual purposes of litigation and business or agency decisions do not fall within its scope"). Thus, unlike the Fifth Circuit, we need not assess whether the tax accrual workpapers carry more of one "aura" than another.

## IV.  Conclusion

The majority's decision may please the IRS and some tax scholars who understandably see discovery of tax accrual workpapers as an important tool in combating fraud. But this decision will be viewed as a dangerous aberration in the law of a well-established and important evidentiary doctrine. Whatever else one may think about this case, the majority's assertion that it is following Maine is plainly erroneous. Rather, the majority's "prepared for" test

is directly contrary to Adlman, a decision we explicitly adopted in Maine.

In straining to craft a rule favorable to the IRS as a matter of tax law, the majority has thrown the law of work-product protection into disarray. Circuits have already split interpreting the meaning of "anticipation of litigation," between the "primary purpose" and "because of" tests. Now this court has proceeded to further the split by purporting to apply the "because of" test while rejecting that test's protection for dual purpose documents. In reality, the majority applied a new test that requires that documents be actually "prepared for" use in litigation. The time is ripe for the Supreme Court to intervene and set the circuits straight on this issue which is essential to the daily practice of litigators across the country.

The correct test is that spelled out in Adlman, and adopted by most circuit courts. Applying that test to the facts actually found by the district court, these tax accrual workpapers should be protected. For these reasons, I respectfully dissent.